# United States Court of Appeals for the Federal Circuit

---

**SHENYANG YUANDA ALUMINUM INDUSTRY ENGINEERING CO., LTD., YUANDA USA CORP.,**
*Plaintiffs*

**JANGHO CURTAIN WALL AMERICAS CO. LTD., PERMASTEELISA NORTH AMERICA CORP., PERMASTEELISA SOUTH CHINA FACTORY, PERMASTEELISA HONG KONG LIMITED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, ARCHITECTURAL GLASS & ALUMINUM COMPANY, WALTERS & WOLF, BAGATELOS ARCHITECTURAL GLASS SYSTEMS, INC.,**
*Defendants-Appellees*

---

2018-1553, 2018-1554

---

Appeals from the United States Court of International Trade in Nos. 1:14-cv-00106-LMG, 1:14-cv-00107-LMG, 1:14-cv-00108-LMG, Judge Leo M. Gordon.

---

Decided: March 18, 2019

---

ARTHUR K. PURCELL, Sandler Travis & Rosenberg, P.A., New York, NY, argued for plaintiff-appellant Jangho Curtain Wall Americas Co. Ltd. Also represented by KRISTEN SMITH, Washington, DC; EMI ITO ORTIZ, Miami, FL.

EMILY LAWSON, Harris Bricken McVay Sliwoski, LLP, Seattle, WA, argued for plaintiffs-appellants Permasteelisa North America Corp., Permasteelisa South China Factory, Permasteelisa Hong Kong Limited. Also represented by ADAMS LEE.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by REGINALD THOMAS BLADES, JR., JEANNE DAVIDSON, JOSEPH H. HUNT; SCOTT DANIEL MCBRIDE, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

DAVID MATTHEW SPOONER, Barnes & Thornburg LLP, Washington, DC, argued for defendants-appellees Architectural Glass & Aluminum Company, Walters & Wolf, Bagatelos Architectural Glass Systems, Inc. Also represented by CHRISTINE JULIET SOHAR HENTER, CLINTON YU.

---

Before PROST, *Chief Judge,* NEWMAN and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge*.

In 2011, acting under 19 U.S.C. §§ 1671, 1673, and related provisions, the United States Department of Commerce issued antidumping and countervailing duty orders covering aluminum extrusions from the People's Republic of China. Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30,650, 30,650–53 (Dep't of

Commerce May 26, 2011) (antidumping duty order) (AD Order); Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30,653, 30,653–55 (May 26, 2011) (countervailing duty order) (CVD Order). Questions arose immediately about the application of the AD & CVD Orders to various imports from the People's Republic of China that involve a "curtain wall"—the non-structural cladding of certain buildings such as office towers, composed of panels having aluminum frames and glass or other sheathing material, with the panels attached to steel, concrete, or other structural building elements. We have addressed that subject once before. In 2012, in a matter involving some of the plaintiffs in the present cases, three domestic companies sought and obtained from Commerce a ruling that certain imports of portions of an overall curtain wall are within the scope of the AD & CVD Orders, and we upheld Commerce's determination. *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) (*Yuanda CAFC 2015*).

In 2013, while that matter was pending in the Court of International Trade, Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. and Yuanda USA Corp. (collectively, Yuanda) initiated the present matter. Yuanda sought a scope ruling from Commerce that the AD & CVD Orders do not cover curtain wall units when imported under a contract for an entire curtain wall. Commerce initiated a scope inquiry and solicited participation by "interested parties." J.A. 586. Jangho Curtain Wall Americas Co., Ltd. (Jangho) and Permasteelisa North America Corp., Permasteelisa South China Factory, and Permasteelisa Hong Kong Ltd. (collectively, Permasteelisa) participated, supporting Yuanda's position. In March 2014, Commerce rejected the position of Yuanda, Jangho, and Permasteelisa and ruled that the AD & CVD Orders cover the curtain wall units at issue.

Yuanda, Jangho, and Permasteelisa challenged that determination, each filing its own complaint in the Court

of International Trade, which consolidated the cases with the parties' agreement. After a series of remands and resulting agency rulings, the Court of International Trade ultimately affirmed Commerce's determination that the AD & CVD Orders cover—and do not exclude—the curtain wall units shipped pursuant to a contract for a full wall. The Court of International Trade's judgment ordered liquidation, in accordance with the decision, of entries whose liquidation had been preliminarily enjoined, including entries by Jangho and Permasteelisa. J.A. 26–27.

Jangho and Permasteelisa have appealed to this court. We undisputedly have statutory jurisdiction under 28 U.S.C. § 1295(a)(5). We hold that Jangho and Permasteelisa have constitutional standing, and we affirm the decision of the Court of International Trade.

## I

### A

The language of the AD & CVD Orders is materially the same for present purposes, so we quote only the AD Order. In defining the "Scope of the Order," the AD Order begins by stating that "[t]he merchandise covered by the order is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from" specified aluminum alloys. 76 Fed. Reg. at 30,650. After some language not pertinent to the present issues, the AD Order then states that it covers aluminum-extrusion "parts for" finished products, but not finished merchandise itself; that parts for curtain walls are among the parts covered; and that the covered parts include "subassemblies" unless "imported as part of" a specified "finished goods 'kit'":

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture.

> Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

*Id.* at 30,650−51.

The AD Order goes on to reinforce and elaborate on the above language in several ways. It expressly "excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry." *Id.* at 30,651. Relatedly, the AD Order expands on the "finished goods kit" exclusion, applicable to certain finished goods entering in kit form:

> The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

*Id.* In 2012, in another proceeding, Commerce summarized some of the above by stating that subassemblies are products that are designed to work with other parts to form a larger structure or system and are excluded from coverage

if they "enter the United States as 'finished goods' or 'finished goods kits' and . . . require no further 'finishing' or 'fabrication.'" Preliminary Scope Ruling: Aluminum Extrusions from the People's Republic of China, *Initiation and Preliminary Scope Ruling on Side Mount Valve Controls*, Nos. C-570-968 & A-570-967 (Dep't of Commerce Sept. 24, 2012) at 6–7; J.A. 532–33.

B

Congress has authorized Commerce to make determinations of "whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Commerce has implemented the statute by adopting a regulatory procedure for "[s]cope rulings." 19 C.F.R. § 351.225.

In a letter dated March 26, 2013, Yuanda petitioned Commerce for a scope ruling on whether "complete and finished curtain wall units that are produced and imported pursuant to a contract to supply a complete curtain wall" are covered by the AD & CVD Orders. J.A. 453 (capitalization omitted). Commerce invited participation by "interested parties." J.A. 586.[1] Jangho and Permasteelisa (as

---

[1] The statute defines "interested party," as relevant here, to include "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise." 19 U.S.C. § 1677(9)(A). The statute defines "subject merchandise" to mean "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title [repealed], or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25). The statutory definition of "interested party" governs matters arising under 19 U.S.C. § 1516a. *See* 19 U.S.C. § 1516a(f) ("For

well as a coalition of domestic companies) filed comments as interested parties: "Jangho and Permasteelisa claimed, and Commerce accepted, that each of them was 'a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise,'" U.S. Br. at 35, and the Court of International Trade so found as well, *Shenyang Yuanda Aluminum Industry Engineering Co. v. United States*, 146 F. Supp. 3d 1331, 1333 n.3 (Ct. Int'l Trade 2016) (*February 2016 CIT Decision*).

On March 27, 2014, Commerce issued its "Final Scope Ruling on Curtain Wall Units that are Produced and Imported Pursuant to a Contract to Supply a Curtain Wall" (*March 2014 Commerce Ruling*), determining that the curtain wall units at issue are covered by the AD & CVD Orders. J.A. 422–49. Commerce rested its determination on two conclusions. First, quoting the AD & CVD Orders' "parts" language, Commerce concluded that "a curtain wall unit is covered by the [AD & CVD Orders] based on the plain language of the scope": "A curtain wall *unit* is a 'part[] for . . . curtain walls' because it is but one piece of the finished product which forms the entire outer structure of the building." J.A. 443 (footnote omitted; emphasis added). Second, Commerce concluded that "curtain wall units imported in various combinations and staged to ultimately form a curtain wall are not finished goods kits." J.A. 445. For those reasons, Commerce found "that Yuanda's curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall are with the scope of the" AD & CVD Orders. J.A. 448.

Two weeks later, Commerce issued an instruction to U.S. Customs and Border Protection (CBP). It told CBP

---

purposes of this section . . . (3) The term 'interested party' means any person described in section 1677(9) of this title."); *see also* 19 C.F.R. § 351.102 (referring to statutory definitions for part 351).

that it had "found that Yuanda's curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall are within the scope of the order." J.A. 615. In the next sentence, reflecting the title and reasoning of the *March 2014 Commerce Ruling*, Commerce stated its conclusion in general, non-company-specific terms: "Curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall fall short of the final finished curtain wall that envelops an entire building." *Id.* Commerce then instructed in general terms: "CBP should suspend liquidation of entries of curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall . . . ." *Id.* That language was not limited to Yuanda's entries; it was more general, thus also covering Jangho's and Permasteelisa's entries.[2]

On April 25, 2014, Yuanda challenged the *March 2014 Commerce Ruling* by filing an action in the Court of International Trade under 19 U.S.C. § 1516a(a)(2)(A)(ii) and (a)(2)(B)(vi) and 28 U.S.C. § 1581(c). *See* J.A. 409 (Docket for CIT Case No. 14-00106; summons and opening of case, with complaint filed May 21, 2014). On May 23, 2014, Jangho and Permasteelisa brought their own separate actions (CIT Case Nos. 14-00107 and 14-00108, respectively) to challenge the *March 2014 Commerce Ruling*, alleging expressly that as a result of that ruling their products were now subject to antidumping and countervailing duties. J.A. 590 ("As a result of Commerce's scope ruling, Jangho's curtain wall systems and curtain wall units are now subject to the aluminum extrusions orders."), 602 ("As a result of Commerce's *Scope Ruling*, Permasteelisa's curtain wall

[2] On March 21, 2018, Commerce amended its more general instructions to CBP so that the instructions would limit the "suspen[sion] of liquidation of entries [to] Yuanda's curtain wall units." J.A. 756. Our decision is not altered by Commerce's changes to its instructions to CBP.

is now subject to the [AD & CV] *Orders*."). The government never filed a pleading or motion to contest that allegation or to dismiss or otherwise grant judgment against Jangho's or Permasteelisa's complaints on standing grounds. Instead, on July 16, 2014, the Court of International Trade granted the government's unopposed motion to consolidate Jangho's and Permasteelisa's cases with Yuanda's. *See* J.A. 411; Consented Mot. to Consolidate Cases, *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, No. 1:14-cv-00106-LMG (CIT Case 106), ECF No. 26; Order Granting Mot. To Consolidate Cases, CIT Case 106, ECF No. 28.

In September 2014, Yuanda, Jangho, and Permasteelisa each filed a motion for judgment on the agency record under U.S. Court of International Trade Rule 56.2. J.A. 411−12; Mots. for J. on Agency R., CIT Case 106, ECF Nos. 37, 38, 39; . On December 9, 2014, Commerce filed an unopposed motion to voluntarily remand the consolidated matters to Commerce, and the court granted the remand the same day. *See* J.A. 412–13; Consented Mot. to Remand Case, CIT Case 106, ECF No. 49; Order Granting Mot. for Voluntary Remand, CIT Case 106, ECF No. 50. The purpose of the remand was for Commerce to consider an exhibit concerning curtain walls that was in the record of the underlying investigations that led to the AD & CVD Orders (J.A. 359–10) but that Commerce had not considered in March 2014 because no party had relied on it.

Before the remand got underway, Jangho and Permasteelisa asked the Court of International Trade to issue preliminary injunctions to stop liquidations of their entries of curtain wall units imported under contracts for entire curtain walls. J.A. 413; CIT Docket Nos. 54 (Dec. 16, 2014), 57 (Dec. 19, 2014). After Permasteelisa modified its initial request, the government did not oppose issuance of preliminary injunctions covering Jangho or Permasteelisa, whether on standing grounds or on any other basis. *See* J.A. 413; CIT Docket No. 59 (Dec. 19, 2014) (government

statement of affirmative agreement as to Permasteelisa). On December 23, 2014, the Court of International Trade granted preliminary injunctions against liquidations of Permasteelisa's and Jangho's "entries of curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall identified in the administrative scope proceeding . . . entitled 'Final Scope Ruling on Curtain Wall Units that are Produced and Imported Pursuant to a Contract to Supply a Curtain Wall,' dated March 27, 2014." J.A. 413; CIT Docket Nos. 62 (Permasteelisa merchandise), 63 (Jangho merchandise). Commerce informed CBP of those injunctions concerning Jangho's and Permasteelisa's merchandise. *See* J.A. 688, 692, 696, 700.

On the voluntary remand, Commerce reviewed the previously undiscussed exhibit and, on March 11, 2015, reached the same conclusion it had reached in March 2014. *See* Final Results of Redetermination Pursuant to Court Remand (*March 2015 Commerce Ruling*); J.A. 300–17. By that time, this court had rendered its decision in *Yuanda CAFC 2015*, as Commerce noted. J.A. 308–09. Focusing on the AD & CVD Orders' language concerning what a kit must contain "at the time of importation" to come within the "finished goods kit" exclusion, Commerce concluded: "a unitized curtain wall shipped as curtain wall units can be excluded as a 'finished goods kit,' but only if all of the necessary curtain wall units are imported at the same time in a manner that they can be assembled into a finished curtain wall upon importation." J.A. 315; *see* J.A. 317 ("[F]or the 'finished goods kit' exclusion to be met in the context of unassembled unitized curtain walls, *all* the necessary curtain wall units must be imported at the same time as a single entry to assemble the curtain wall."). Commerce relied on the AD & CVD Orders and the filings leading up to their issuance, together with concerns about administering a rule that would require temporally extended monitoring of related entries. J.A. 313–41. "As this [interpretation] does not describe Yuanda's merchandise, the 'finished goods kit'

exclusion does not apply to its curtain wall units exported pursuant to a curtain wall contract." J.A. 317.

Upon the filing of the *March 2015 Commerce Ruling* with the Court of International Trade, Yuanda, Jangho, and Permasteelisa renewed their challenges and provided additional briefing to support their motions under Rule 56.2 for judgment on the agency record. The government opposed their motions and, in its opposition, asked for judgment in its favor. *See* J.A. 415; Def.'s Resp. to Pls.' Rule 56.2 Mots., CIT Case 106, ECF No. 85. On February 9, 2016, the Court of International Trade remanded for a second time. *February 2016 CIT Decision*, 146 F. Supp. 3d at 1354. The court noted that the evidence suggested that "'it is simply not possible for a complete curtain wall to enter as a "kit"'—i.e., all at once." *Id.* at 1351. For that and other reasons, the court deemed unreasonable Commerce's position, or at least Commerce's explanation of its position in light of earlier scope rulings, that an entire curtain wall needs to be imported at the same time to be excluded from the AD & CVD Orders; the court suggested that it should suffice if a "subassembly" arrived containing everything needed to assemble that subassembly, with no further finishing or fabrication. *Id.* at 1342–54.[3]

---

[3] Besides defending the *March 2015 Commerce Ruling*, the government opposed the argument by Jangho and Permasteelisa that Commerce must expressly include them and their merchandise in instructions to CBP regarding liquidation, even while the government acknowledged: "We expect that CBP will consider Commerce's scope rulings in determining whether future entries of the same or similar merchandise are covered by the scope of the orders, so Jangho and Permasteelisa are correct in claiming that, to the extent they import curtain wall units pursuant to a curtain wall contract, the [*March 2014 Commerce Ruling*]

In its May 12, 2016 ruling on remand, Commerce registered its "respectful protest" against the legal analysis of the *February 2016 CIT Decision*. Final Results of Redetermination Pursuant to Court Remand, CIT Case 106, ECF No. 109 (*May 2016 Commerce Ruling*); J.A. 148. Commerce expanded the record and conducted further analysis. J.A. 146–249. Relying on this court's *Yuanda CAFC 2015* decision, Commerce reiterated its view that only a curtain wall, not a curtain wall unit, is a finished good and that the exclusion at issue requires (as a threshold condition, not the only condition) entry at the same time of all units that will form a curtain wall. J.A. 172–74. Commerce also observed that "even if curtain wall units were a final, finished good, which the Federal Circuit has rejected, . . . in addition to fasteners, there are additional procedures which are needed to install a curtain wall unit into a curtain wall," so that "curtain wall units are not ready to be installed upon importation 'as is,' such that they could" fall within the AD & CVD Orders' exclusion at issue. J.A. 175; *see* J.A. 188–98. But Commerce read the *February 2016 CIT Decision* as precluding a scope ruling that would make the AD & CVD Orders' exclusion unavailable if the record showed that curtain wall units are not regularly, or perhaps ever, imported so that all units needed for a single wall arrive at the same time under a single-entry form. J.A. 183. On that understanding, because the record contained no "evidence that any exporter or importer in the curtain wall industry ships its curtain wall units in [that] manner," J.A. 249, Commerce ruled, "in accordance with the [*February 2016 CIT Decision*] and under protest," that "Yuanda's curtain wall units imported pursuant to a long-term contract are

---

and [*March 2015 Commerce Ruling*] will be relevant to CBP's analysis." Defendant's Resp. to Plaintiffs' Rule 56.2 Motions at 37, CIT Docket No. 85 (Sept. 18, 2015). The court did not reach that issue. *February 2016 CIT Decision*, 146 F. Supp. 3d at 1354 n.160.

excluded from the scope" of the AD & CVD Orders. J.A. 183; *see* J.A. 249. Although Commerce observed that it "continues to conduct its analysis solely on Yuanda's merchandise," J.A. 229, much of its analysis identified grounds for coverage by the Orders that could readily apply to others' merchandise.

The domestic industry parties, who were on the losing end of Commerce's (under-protest) ruling, turned to the Court of International Trade—which rejected Commerce's conclusion that the *February 2016 CIT Decision* had compelled finding the exclusion applicable and remanded once again. *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 181 F. Supp. 3d 1348, 1360 (Ct. Int'l Trade 2016) (*October 2016 CIT Decision*). The court instructed Commerce to focus on whether each curtain wall unit is a finished "discrete subunit," rather than asking "whether the product at issue is 'a part of a larger structure or system.'" *Id.* at 1357–59. And it noted, as warranting further consideration, facts that Commerce had mentioned in its May 2016 ruling—the additional procedures and materials required for finishing a group of curtain wall units making up less than a full curtain wall. *Id.* at 1359–60.

On January 19, 2017, Commerce entered its Final Results of Third Redetermination Pursuant to Court Remand (*January 2017 Commerce Ruling*). J.A. 39–118. Commerce determined, as it had in March 2014 and March 2015, that the curtain wall units at issue are *not* excluded from the coverage of the AD & CVD Orders. J.A. 118. Commerce reconsidered the origin of the relevant exclusion language of the AD & CVD Orders and determined that the Petitioner (seeking those Orders) "intended for that exclusion to apply only when all the parts making up a finished curtain wall are imported into the United States as one entry and can be fully assembled into a finished curtain wall at that time," even if the Petitioner may "not have considered, or known, that, as a rule, curtain walls do not enter the United States as a single entry." J.A. 57. Commerce

reiterated that, under this court's *Yuanda CAFC 2015* decision, the curtain wall units for a single curtain wall, when entered separately over an extended time, are not within the exclusion. J.A. 59–65. But Commerce now also made findings of fact that the curtain wall units at issue are outside the exclusion on the narrower ground that they are not ready for installation "as is" but instead require additional material, and further finishing and fabrication, for assembly. J.A. 65–74.

The Court of International Trade upheld that ruling. *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 279 F. Supp. 3d 1209 (Ct. Int'l Trade 2017) (*December 2017 CIT Decision*), J.A. 34–37. The court relied on Commerce's narrower findings establishing that "the individual curtain wall units do not contain all parts necessary to install them," require further finishing or fabrication before assembly, and hence are "not suitable for installation 'as is.'" *Id.* at 1213–14. The court issued its Judgment the same day, ordering liquidation of entries that had been subject to the preliminary injunctions, which include entries by Jangho and Permasteelisa. J.A. 26−27.

Jangho and Permasteelisa appeal. Yuanda does not.

## II

Before defending both Commerce's broader and narrower rationales as grounds to affirm the Court of International Trade's decision, the government presents a threshold jurisdictional contention as a ground for dismissal of the appeals. It argues that Jangho and Permasteelisa lacked constitutional standing to bring their cases to challenge Commerce's scope ruling. We review whether a party has standing de novo, *Rack Room Shoes v. United States*, 718 F.3d 1370, 1374 (Fed. Cir. 2013), though underlying facts are reviewed under the standards appropriate to the procedural setting, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008).

The government raises no statutory objection to Jangho's and Permasteelisa's right to challenge the scope ruling in the Court of International Trade and in this court. It accepts that Jangho and Permasteelisa, having participated by invitation as interested parties in Commerce's proceeding, are authorized by statute to pursue their challenges to Commerce's scope ruling. Indeed, Congress specified in 19 U.S.C. § 1516a(a)(2)(A)(ii) that an "interested party who is a party to the proceeding in connection with which the matter arises may commence an action" to challenge "a determination described in clause (vi) of subparagraph (B)," which is a "determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order," 19 U.S.C. § 1516a(a)(2)(B)(vi); *see also* 28 U.S.C. § 1581(c) (giving the Court of International Trade jurisdiction over any civil action commenced under 19 U.S.C. § 1516a)). Commerce treated Jangho and Permasteelisa as "interested parties." *See* J.A. 586, 431−41, 318−38, 183−249, 75−117. Before us, the government agrees that "Jangho and Permasteelisa participated in the scope proceeding as interested parties." U.S. Br. at 24.

The government contends, however, that Jangho and Permasteelisa lack constitutional standing. For such standing to exist, a plaintiff must have already suffered or be imminently threatened with a concrete, particularized injury, that is fairly traceable to the challenged conduct, and that is likely to be redressed by a favorable court ruling. *See*, *e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Defenders of Wildlife*, 504 U.S. at 560–61. The government argues that, from the outset of their filing of complaints in 2014, Jangho and Permasteelisa have not met those requirements because "the challenged agency decision pertains to Yuanda's merchandise only." U.S. Br. at 24 (capitalization omitted), 27−33. The government frames

its argument as an assertion of lack of standing to challenge "the Yuanda Scope Ruling," *id.* at 22, 29−31, which is the *March 2014 Commerce Ruling*, *id.* at 2, 8, 10, 12−13, 16; it neither differentiates among the Commerce determinations from March 2014 through October 2016, *id.* at 24−27, nor argues that Jangho and Permasteelisa came to lose standing even if they had standing when they filed their complaints in 2014.

The government's argument is simple. It starts with the premise that the only specific subject of Commerce's rulings was Yuanda's merchandise, not anyone else's, and then it asserts that the premise necessarily implies lack of standing for Jangho and Permasteelisa. But that logic is contrary to established law. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is *not* precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (emphasis added); *see Summers*, 555 U.S. at 493 (quoting that conclusion); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 457−58 (D.C. Cir. 2012).

The government's analysis thus stops prematurely. It omits the very inquiry called for and conducted by the just-cited cases, namely, an inquiry into the actual or threatened effect on the plaintiff of the specific challenged agency action and desired judicial relief. That inquiry turns on the facts determined in court, as appropriate to the procedural stage of the decision at issue. *See, e.g.*, *Defenders of Wildlife*, 504 U.S. at 561; *Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1131 n.9 (Fed. Cir. 2008); *Asahi Seiko Co. v. United States*, 755 F. Supp. 2d 1316, 1325 (Ct. Int'l Trade 2011) (discussing the importance of facts when determining if the plaintiff has standing); *Humane Soc. of U.S. v. Brown*, 920 F. Supp. 178, 201 (Ct. Int'l Trade 1996) (discussing the "specific facts" that the plaintiffs alleged to establish standing and the different implications of each stage of litigation). The nature

of the agency ruling and the agency record may, of course, be relevant, but finding Article III standing does not depend on agency findings of the facts for standing; the agency is not the forum for deciding whether the plaintiff meets Article III requirements, which do not apply to agencies. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2143–44 (2016) ("Parties that initiate the [agency] proceeding need not have a concrete stake in the outcome; indeed, they may lack constitutional standing."); *Consumer Watchdog v. Wis. Alumni Research Found.*, 753 F.3d 1258, 1261 (Fed. Cir. 2014) ("To be clear, although Article III standing is not necessarily a requirement to appear before an administrative agency, once a party seeks review in a federal court, 'the constitutional requirement that it have standing kicks in.'").

Conducting the required inquiry, we conclude that Jangho and Permasteelisa have standing. In its complaint challenging the *March 2014 Commerce Ruling*, Jangho expressly asserted: "[a]s a result of Commerce's scope ruling, Jangho's curtain wall systems and curtain wall units are now subject to the aluminum extrusions orders." J.A. 590. Similarly, Permasteelisa asserted: "As a result of Commerce's [*March 2014 Commerce Ruling*], Permasteelisa's curtain wall is now subject to the [AD & CVD] *Orders*." J.A. 602. Those assertions allege that Jangho and Permasteelisa will be concretely harmed by being subjected to the AD & CVD Orders' duties as a result of the challenged ruling. And judicial acceptance of at least some of the rationales Jangho and Permasteelisa advanced for reversing the *March 2014 Commerce Ruling* would give them redress, perhaps even a clear exclusion from the duties, for future shipments if not past shipments. *See also Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261−64 (1977) (standing may exist to sue to remove one major obstacle to securing the desired concrete benefit where a sufficient likelihood exists that

other obstacles can be removed); *Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1364–65 (Fed. Cir. 2015).

Perhaps the government could have contested the clearly alleged facts, or shown why the standing question changed over time, such as when this court decided *Yuanda CAFC 2015* and Commerce eventually relied on a narrower ground (without ever giving up its initial broader ground). But it did not. The government has never made any filing, by way of answer or motion or otherwise, that directly contradicts the just-quoted assertions or treats standing in 2014 as different from standing later. Beyond that, the government first agreed to consolidation of Jangho's and Permasteelisa's cases with Yuanda's, without disputing standing, and then agreed to preliminary injunctions against liquidations of Jangho's and Permasteelisa's merchandise, thus tending to confirm that the outcome of the cases could well affect whether Jangho and Permasteelisa had to pay the duties on their merchandise. The Court of International Trade's ultimate Judgment, directing that their entries be liquidated, adds to that confirmation.

Once one puts aside the legal position of the government we have already rejected as inconsistent with governing precedent, the government has not shown that Commerce's various rulings in this matter themselves contradict the assertions made by Jangho and Permasteelisa about the effects of those rulings on them. Even as a general matter, nothing about the nature of a scope ruling as to a "particular *type* of merchandise," 19 U.S.C. § 1516a(a)(2)(B)(vi) (emphasis added), precludes it from having concrete effects on "interested parties" other than the requester of the ruling, even when the bottom-line conclusion refers specifically to the requester's merchandise. In addressing a type of merchandise, Commerce can adopt an interpretation finding coverage based on conditions that also are met by others' merchandise. *See* 19 C.F.R. § 351.255(k)(1) (Commerce "will take into account . . . prior

scope determinations" when ruling on other requests); note 3, *supra* (quoting Commerce's statement that it expects CBP to consider the Yuanda scope rulings in addressing Jangho's and Permasteelisa's merchandise).

In the present matter, as we have explained, the *March 2014 Commerce Ruling* stated a broad scope interpretation—that the "finished goods kit" exclusion from the AD & CVD Orders is inapplicable unless all curtain wall units for a single curtain wall are part of the same entry. J.A. 445, 448. As also explained above, Commerce communicated its broad interpretation to CBP right after the *March 2014 Commerce Ruling* issued. J.A. 615. On this record, we must find it likely that Jangho's and Permasteelisa's merchandise would be ineligible for exclusion under that interpretation; indeed, Commerce eventually recognized, in its *May 2016 Commerce Ruling*, that it had no evidence that such a single entry for an entire curtain wall ever occurred. J.A. 183, 249

The government has made no argument that a different result is warranted because Commerce eventually articulated a narrower ground for finding Yuanda's merchandise ineligible for the "finished goods kit" exclusion—focused on the materials and work needed for installation of curtain wall units, even if not part of an entire curtain wall entry—and that ground was the basis for the Court of International Trade's affirmance of the ultimate *January 2017 Commerce Ruling*. We have been given no basis for thinking that Jangho and Permasteelisa are not threatened with ineligibility on that same ground. In particular, the government has not argued that the eventual narrowing of grounds makes any difference to the standing inquiry; the government has not differentiated standing in March 2014 from standing at later stages. Regardless, Commerce persisted through all rounds of this proceeding in pressing its broader, single-entry interpretation, *see, e.g.*, J.A. 59–65, 172–74, 315, 317, and it also advances that

view in this court, while featuring the narrower ground, *see* U.S. Br. 54−59.

For the foregoing reasons, taken together, we conclude that Jangho and Permasteelisa have standing to press their challenges in these cases.

III

We review the grant of judgment on the agency record without deference, applying the same standard used by the Court of International Trade in reviewing Commerce's determinations. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016). We review Commerce's scope ruling for any legal error and for substantial-evidence support. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Nan Ya Plastics*, 810 F.3d at 1341; *Yuanda CAFC 2015*, 776 F.3d at 1354. We see neither legal error nor insufficient evidentiary support for the ultimate Commerce determination, and we therefore affirm the Court of International Trade's decision.

In *Yuanda CAFC 2015*, this court upheld Commerce's conclusion that curtain wall units themselves are not "finished merchandise." *See* 776 F.3d at 1359. The only remaining issue for the curtain wall unit entries at issue here is whether they are excluded when viewed (correctly) as subassemblies. We see no error in Commerce's conclusion that they are not so excluded.

We agree with Commerce's straightforward reading of the AD & CVD Orders' language, quoted at the outset of this opinion, as excluding "subassemblies" only if they are "imported as part of the finished goods 'kit'" as defined. *See* 76 Fed. Reg. at 30,651. Commerce adopted two interpretations of the "finished goods kit" definition itself. In its broader ground, pressed throughout this proceeding, Commerce concluded that the "finished goods kit" definition applies to curtain wall units "only if all of the necessary curtain wall units are imported at the same time."

J.A. 315, 317. In its narrower ground of decision, adopted after several remands, Commerce interpreted the definition as requiring, at least, that a subassembly include "all the necessary hardware and components" for, and not "require further 'finishing' or 'fabrication' prior to," installation in an overall finished product (here, the curtain wall). J.A. 65.

We agree with Commerce as to its broader ground for its scope ruling. We conclude that Commerce is correct in its reading of the language of the AD & CVD Orders. The Orders state that "[a] finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good" and also meets the "as is" requirement. 76 Fed. Reg. at 30,651. The straightforward meaning of the quoted language, as applied to curtain walls, is that a "finished goods kit" must contain, "at the time of importation," all the pieces needed to assemble the curtain wall (which this court has already held is the only "final finished good"), which must include all the required curtain wall units. Entering merchandise is not a "finished goods kit" unless it is a "packaged combination" of the required components at the time of importation. That requirement focuses only on the physical contents of the "packaged combination" at a particular time, not on contractual obligations that might link one "packaged combination" to another, later-entering one.

We also agree with Commerce as to its narrower ground. Commerce found that the curtain wall units as entered did not meet the condition that they be ready for installation "as is," and substantial evidence supports that finding. Commerce compared Yuanda's technical drawings of its curtain wall units to its import documentation and found that the material imported would not complete the curtain wall unit because it did not contain hangers, lock panels, shims, and embeds necessary to piece the curtain wall units together. J.A. 35, 67. Once the curtain wall

units are hung, Commerce added, the purchaser would need to waterproof the connection between adjacent units and trim and punch the units to ensure that they fit next to each other. J.A. 68. Commerce also identified other information about additional finishing needed. J.A. 72. On those grounds, Commerce found that the curtain wall units at issue are not ready to be added to the entire curtain wall "as is." *See* 76 Fed. Reg. at 30,651. We have been pointed to no evidence that made it unreasonable for Commerce to find for that reason that the units at issue are not excluded from the AD & CVD Orders, but are within their scope.[4]

IV

For the foregoing reasons, we hold that Jangho and Permasteelisa have standing, and we affirm the judgment of the Court of International Trade.

No costs.

**AFFIRMED**

---

[4] We reject the request of Jangho and Permasteelisa that we order Commerce to clarify its instructions issued to CBP regarding suspension of liquidation. They have not persuasively identified a legal basis for that request. A statutory or regulatory basis for such a request is not established by our constitutional-standing conclusion that Jangho and Permasteelisa are sufficiently threatened with injury by the scope rulings even if they are not the direct subject of those rulings.